RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0330p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TAYLOR STEEL, INC.,

        *Plaintiff-Appellee,*

    *v.*

LANA C. KEETON,

        *Defendant-Appellant.*

No. 02-4167

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00850—Peter C. Economus, District Judge.

Submitted: May 31, 2005

Decided and Filed: August 8, 2005

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge; and CLELAND, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Lana C. Keeton, Coral Gables, Florida, for Appellant. Ronald S. Marshek, RONALD MARSHEK CO. L.P.A., Woodmere Village, Ohio, for Appellee.

    BOGGS, C. J., delivered the opinion of the court, in which CLELAND, D. J., joined. GILMAN, J. (pp. 9-10), delivered a separate dissenting opinion.

_____

## OPINION

_____

    BOGGS, Chief Judge. In a bench trial, Defendant-Appellant Lana Keeton and her company, Great Events, Inc. d/b/a Keeton Corporation,[1] were found jointly and severally liable to Plaintiff-Appellant Taylor Steel for $88,345.78, as a result of Keeton's failure to pay for five truckloads of steel that she ordered from Taylor Steel on behalf of a third party. To hold Keeton liable in her

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] Taylor Steel sued different entities: Great Events, Inc. and Great Events, Inc, d/b/a Keeton Corp. However, only Great Events was ever incorporated. All of Keeton's other businesses (e.g., steel brokerage (Keeton Corporation), boxing promotions (KK Promotions)) were aliases of Great Events. As these entities are not Appellants in this case, we will only speak of the single entity Great Events, Inc. d/b/a Keeton Corp, referred to as Keeton Corp.

personal capacity, the court had to pierce the corporate veil. Keeton appeals pro se, contending that the district court's holding was against the weight of the evidence, that Taylor Steel owed her money because it sold her defective steel, and that the district court improperly pierced the corporate veil to hold her personally liable. The clerk of this court denied Keeton's pro se appeal on behalf of her company, so Keeton, in her individual capacity, is the only appellant. We affirm the district court.

**I**

Keeton, through her company Great Events, Inc. d/b/a Keeton Corp. (Keeton Corp.), of which she is the sole shareholder, officer, director, and employee, acted as a steel broker and outside steel salesperson. The transaction at issue in the suit concerned a large purchase of steel that Keeton Corp. made on behalf of its client, Mountain Metals, from Taylor Steel. Keeton Corp. placed the Mountain Metals order for 500 tons of steel in August 2000. As per Taylor Steel's standard practice with Keeton Corp., the company was sold steel on a limited credit line, requiring either cash in advance or payment within ten days of invoicing. Taylor Steel had maintained these terms with Keeton Corp. since first doing business with the company in 1997, due to its knowledge that Keeton Corp. had limited credit and generally did business on a cash flow basis.

Keeton Corp. paid in a timely fashion for the first ten truckloads of steel shipped to Mountain Metals. This suit concerns the last five truckloads, shipped during January and February 2001, amounting to $94,860.98 worth of steel. In order to pay for these shipments, Keeton obtained a letter of credit from Mountain Metal made out to Keeton Corp., not to Taylor Steel. The five truckloads were shipped, Mountain Metals paid Keeton Corp. on the letter of credit, but Keeton Corp. never paid Taylor Steel.

The parties have stipulated to all of these facts. The parties also stipulate that Keeton Corp. returned three coils of steel as unacceptable and that Taylor Steel credited Keeton Corp. the full amount of these coils. The stipulated total amount owed on the five truckloads of steel, then, is $88,345.78. Taylor Steel sued for an action upon an account and for fraud and sought to pierce the corporate veil.

The Defendants counterclaimed for breach of commissions contract, breach of contract, and tortious interference with contracts and business relationships. Asserting–apparently for the first time–in their counterclaim that the steel shipped to Mountain Metals was not prime steel and that it was not properly warranted, Defendants calculated that they owed Taylor Steel only $14,847.16. In addition, Defendants sought damages in the amount of $199,352 for (1) commissions that Keeton claimed Taylor Steel owed Keeton for sales made to D.T. Sari, a company Keeton had brought to Taylor Steel; and (2) for Taylor Steel's tortious interference with Keeton's business relationship with Mountain Metal in selling directly to that company. Keeton claims that she refused to pay Taylor Steel and ceased all communications with that company in March 2001 due to these complaints. Taylor Steel offered proof that it continued to pay Keeton her commission and refrained from dealing directly with Mountain Metals as long as Keeton was in contact with Taylor Steel.

After Taylor Steel initiated the present suit, Keeton closed the Keeton Corp. bank account, put Great Events, Inc. and Keeton Corp. out of business, and formed a new company, Lana Keeton, LLC, to continue her steel brokering business.

The district court found Keeton Corp. liable for the full $88,345.78 and pierced the corporate veil to extend liability to Keeton herself. The court denied Taylor Steel's complaint for fraud, finding that Keeton Corp. did not contract with Taylor Steel with the intent to defraud it, and the court denied all of the Defendants' counterclaims. This appeal, ostensibly on behalf of Keeton Corp. and Lana Keeton individually, followed.

Because neither a corporate officer nor a shareholder may appear on behalf of the corporation, the clerk of the court properly denied Keeton the right to represent her company. *Doherty v. American Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 602-03 (6th Cir. 1988); *see also Rowland v. California Men's Colony*, 506 U.S. 194, 201-02 (1993); *In re K. M. A., Inc.*, 652 F.2d 398, 399 (5th Cir. 1981). Therefore, we consider only the question of Keeton's personal liability for the corporate liability.

## II

We review the factual findings of the district judge in a bench trial for clear error, and the legal findings *de novo*. *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004). Great deference is demanded when the factual findings required the judge to make credibility determinations. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). This being a diversity case, the district court looked to the choice of law provisions of the forum state (Ohio), properly leading it to apply Ohio law.

Under Ohio law, "an action on an account is appropriate where the parties have conducted a series of transactions, for which a balance remains to be paid." *AMF, Inc. v. Mravec,* 440 N.E.2d 600, 601 (Ohio App. 1981), paragraph 1 of the syllabus. To succeed in an action on an account, the plaintiff must prove both all the elements of the contract and that the contract is one that involves transactions usually the subject of a book account. *Am. Sec. Serv., Inc. v. Baumann*, 289 N.E.2d 373, 378 (Ohio App. 1972). The parties produced invoices demonstrating the transactions in question. They further stipulated to the contract to pay for the five truckloads of steel and the failure to make that payment.

The district court found unsupported Keeton's claims that she withheld payment because the shipped steel was not prime, as specified in the order, and because Taylor Steel owed her money from past commissions and was trying to deprive her of future earnings by direct dealing with her customers. The evidence for all of this derives entirely from Keeton's trial testimony, which the judge did not find credible. Keeton produced no other evidence that she complained about the quality of the steel to Taylor Steel, nor has Mountain Metals complained. And while the district judge chose to believe Taylor Steel's unsupported testimony that the steel had been properly warranted rather than Keeton's unsupported testimony that it had not, we defer to the reasonable credibility determinations of the district judge. Thus, this finding of fact cannot be said to be clearly erroneous.

Furthermore, Taylor Steel produced undisputed evidence that, as late as March 2001, it had continued to pay Keeton commissions and it had promised not to deal directly with Mountain Metals. At that point, Keeton ceased all communication with Taylor Steel, refusing to answer phone calls from the company and refusing to pay the money she owed it. Keeton's oral contract to represent Taylor Steel as an outside salesperson and as a broker presupposed that she would be "actively trying to solicit sales" for the company. Once she ceased to communicate with Taylor Steel in March 2001, she was no longer acting in the company's interest, and the company was no longer obligated to avoid direct dealing with her clients or to pay her a commission on sales it continued to make to clients she had brought it.

Therefore, we find that the judge did not clearly err in finding the Defendant companies liable to Taylor Steel for the full amount owed on the five truckloads of steel shipped to Mountain Metals.

### III

We are somewhat less sanguine about the district court's decision to pierce the corporate veil. Nonetheless, we affirm on different grounds. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (pointing out that "[b]ecause this court's de novo review involves only application of legal propositions to the undisputed facts in the record, we may affirm on any grounds supported by the record even if different from the reasons of the district court"). Under Ohio law,

> the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993). The first element is a restatement of the alter-ego doctrine, which requires that plaintiff "show that the individual and the corporation are fundamentally indistinguishable." *Ibid.* In deciding whether the company is an alter ego of the individual, Ohio courts consider such factors as:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio App. 1991). However, "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001) (applying Ohio law).

Applying the criteria listed in *LeRoux's Billyle*, the district court held that Keeton was the alter ego of Keeton Corp. because: (1) Keeton was the president and sole shareholder of Great Events, Inc. d/b/a Keeton Corp. and made all corporate decisions; (2) Keeton said, "I am Keeton Corporation;" (3) the company was "a financially desperate entity in terms of capitalization and revenue," having only $459.99 in its corporate account and owing $15,000 on its line of credit account, even while it was purchasing tens of thousands of dollars of steel from Taylor Steel; (4) Keeton did not produce any corporate records or minutes showing that Great Events, Inc. d/b/a Keeton Corp. was maintaining the proper corporate formalities, and that Keeton testified that "she did not keep any records or 'lists' of account receivables [sic];" and (5) Keeton commingled funds. We point out, as a preliminary matter, that several of these findings do not stand up under close scrutiny.

First, the district judge placed a great deal of weight on Keeton's statement at trial that "I am Keeton Corporation." Keeton made this statement when, on cross-examination, Taylor Steel's counsel asked her, "As of March 15th in the year 2001, you had not spoken to Keeton Corporation for at least a month?" Keeton answered, "I am Keeton Corporation." To which counsel replied, "I'm sorry, with Taylor Steel." Keeton was doing nothing more here than pointing out to the

attorney that he had misspoken. Taking this statement out of context to assert that Keeton was claiming that her personal identity was synonymous with Keeton Corp.'s was erroneous.

Second, although inadequate capitalization is often a key justification for piercing the corporate veil, it is not an absolute prerequisite. *See LeRoux's Billyle*, 602 N.E.2d at 690. Keeton Corp., as a steel brokering firm, operated on cash flow, a reality that Taylor Steel acknowledged when it gave the company very limited credit terms. Keeton Corp. only incurred liabilities when it bought steel, and it only bought steel when a customer wanted it. Presuming that Keeton Corp.'s customers paid for the steel, as did Mountain Metals in this case, the company should not necessarily have been unable to pay its debts just because its capitalization was minimal.

Third, the district judge's assertion that Keeton failed to keep a "list" of accounts receivable is meaningless in light of Keeton's unrebutted testimony that she kept a "file" of invoices recording her accounts receivable. And while Taylor Steel placed a great deal of emphasis on the fact that Keeton did not register the name "Keeton Corporation" in Florida, its place of business, until December 2000, the trial exhibits show that Keeton Corp. began doing business in Florida as a foreign corporation in March 2000, filed its fictitious name in August 2000, had notice of the name published in a Miami newspaper in September 2000, and was notified in October 2000 of an omission in the filing requiring it to refile. While Keeton may have been remiss in not filing immediately upon doing business in Florida, the evidence does not show that she refrained from filing in order to defraud Taylor Steel.

Finally, the district judge found that Keeton commingled funds of her various companies, all d/b/a of Great Events, Inc., "*during the period in which she owed Taylor Steel the outstanding balance.*" (Emphasis added.) While we will discuss the issue of commingling further below, in the events to which the judge refers, Keeton used Great Events accounts to fund what she called business trips abroad. She claims the purpose of these trips was to promote boxing matches. The judge chose not to believe this testimony. Regardless of his assessment of Keeton's veracity, however, the judge's statement of timing is incorrect. All of the events to which he refers took place one year *before* the problem with non-payment to Taylor Steel arose.

These errors notwithstanding, we find that under Ohio law, Taylor Steel did meet its burden of proving that Keeton was the alter ego for her businesses. As *Belvedere* explains, the corporate form is a legal fiction created for convenience that may be disregarded when the purpose for which it was intended is abused. 617 N.E.2d at 1085. For this reason, Ohio law allows the corporate veil to be pierced and individual shareholders or directors held liable "when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Ibid*. We find that Keeton abuses the corporate form when she uses it in this suit to shield herself from liability for the debts she, and she alone, caused her company to incur to Taylor Steel. We note once again that piercing the corporate veil is an equitable remedy, available not where a set list of factors are established but where maintaining the corporate form would work injustice upon an innocent party.

A number of factors persuade us that the veil should be pierced in this case. Taylor Steel demonstrated that Keeton exercised complete dominion over Keeton Corp. and that she alone decided on behalf of the corporation to withhold payment for the 5 truckloads of steel. While Keeton did create a separate identity for her company, maintaining, for example a separate bank account, email address, and phone number for it, as the sole officer, director, and shareholder, she made all of the company's decisions. One of those decisions was to withhold payment from Taylor Steel even though Mountain Metals had paid Keeton Corp. Another decision was to refuse to take the calls from Taylor Steel seeking payment. A third decision was to hold hostage the money Keeton Corp. owned Taylor Steel because Keeton, in her individual capacity as an outside salesperson for Taylor Steel, believed she was not receiving her proper commission.

Furthermore, Keeton had sole control over the movement of funds among her various businesses. While she normally paid Taylor Steel from accounts belonging to Keeton Corp., sometimes she chose to pay from accounts belonging to Great Events, Inc. She testified that she paid Keeton Corp.'s bills from whichever of her various corporate accounts had the necessary funds. While we do not believe that this amounted to commingling of funds, since each of Keeton's business entities were merely d/b/a of Great Events, we do find that it indicated her absolute control over these businesses.

Although "[a] corporation is a separate legal entity from its shareholder even where there is only one shareholder in the corporation," *Zimmerman v. Eagle Mortgage Corp*, 675 N.E.2d 480, 485 (Ohio Ct. App. 1996), Ohio courts have held that the existence of only a single shareholder can be a powerful indicator of that shareholder's exercising control so complete over the corporation that it "had no separate mind, will or existence of its own." *Stypula v. Chandler*, No. 2002-G-2468, 2003 WL 22844296, at *2 (Ohio Ct. App. Nov. 26, 2003) (sole shareholder and director held personally liable); *Zimmerman*, 675 N.E.2d at 486 (same); *Intergy, Inc. v. Carrigan*, No. 62210, 1993 WL 127089, at *2 (Ohio Ct. App. Apr. 22, 1993) (same). Based on the evidence that Keeton used Keeton Corp. and the other Great Events, Inc. d/b/a entities as a convenient forum for her various personal business ventures, we find that she so completely dominated Keeton Corp. that it had no mind or will of its own and was nothing but Keeton's alter ego.

With regard to the other claims of commingling of funds and failure to maintain corporate formalities, we do not find that Taylor Steel has met its burden on these points; the record contains hints, but nothing resembling proof of these claims. *Univ. Circle Research Ctr. Corp. v. Galbreath Co.*, 667 N.E.2d 445, 449 (Ohio App. 1995) (holding that the party seeking to pierce the corporate veil bears the burden of proving that grounds for this action exist). However, arguably the reason the record is so nearly silent is because Keeton intransigently refused, despite repeated requests from Taylor Steel and judicial orders, to turn over the relevant documents, including accounts receivable, lists of suppliers or business transactions, corporate minutes, personal financial records, or records of Lana Keeton, LLC. In a recent case concerning a claim to pierce the corporate veil, an Ohio court held that where corporate records were not in evidence because the defendant refused to produce them, the "failure to produce those corporate records after being requested to do so demonstrates an absence of corporate records." *State of Ohio, ex rel. v. Tri-State Group, Inc.*, No. 03-BE-61, 2004 WL 1882567, at *12 (Ohio App. Aug. 20, 2004). We agree that Keeton should not be permitted to profit from her refusal to produce evidence legitimately requested by Taylor Steel during discovery.

The situation presented here is somewhat analogous to the spoliation of evidence, "the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction." *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003); *Austral-Pacific Fertilizers, Ltd. v. Cooper Industries, Inc.*, 108 F.3d 1376 (6th Cir. 1997) (table). Under Ohio law, the spoliation must cause prejudice, which occurs where there is "a reasonable possibility, based on concrete evidence, that access to the [missing material] would have produced evidence favorable to" the objecting party. *Bright v. Ford Motor Co.*, 578 N.E.2d 547, 549 (Ohio App. 1990). We believe that the evidence that Keeton used her various business accounts interchangeably, that she made irregular transfers from her Keeton Corp. account to her personal account, that she failed to keep financial statements, and that she failed to register the Keeton Corp. alias in Georgia, where Great Events, Inc. was incorporated, provides sufficient concrete evidence that, had Keeton turned over all of the documents Taylor Steel sought, Taylor Steel would have been able to meet its burden of showing failure to maintain corporate formalities and at least some degree of commingling.

In addition to finding that Keeton was the alter ego of her corporation, the *Belvedere* test also requires us to find that Keeton's personal "control over the corporation . . . was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and [that] injury or unjust loss resulted to the plaintiff from such control and wrong." 617

N.E.2d at 1086.  While the last element is self-evident, since Taylor Steel was never paid the $88,345 owed it, the second element requires us to engage in an analysis of recent Ohio case law.

"When and how state law applies to a particular case is a matter on which the state supreme court has the last word."  *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995).  We only anticipate how the state's supreme court would rule on an issue of state law when the law of the state is unsettled.  *C & H Entertainment, Inc. v. Jefferson County Fiscal Court*, 169 F.3d 1023, 1025 (6th Cir. 1999).  To perform such a task, we look to the decisions of the state's intermediate courts unless we are convinced the state supreme court would decide the issue differently.  *United of Omaha Life Ins. Co. v. Rex Roto Corp.*, 126 F.3d 785, 789 (6th Cir. 1997).

On its face, the *Belvedere* test is quite clear: the individual had to use the corporation to "commit fraud or an illegal act."  617 N.E.2d at 1086.  The district court found that Keeton did not commit fraud, and Taylor Steel does not appeal that ruling.  Breach of contract might give rise to a civil suit, but it is not illegal.  We have in the past held that *Belvedere* meant what it said and that "a simple breach of contract cannot suffice as the type of 'illegal' or fraudulent act intended by the court in *Belvedere*."  *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 674 (6th Cir. 1999); *see also In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 333 (6th Cir. BAP 1999).

That would end our analysis except for the fact that in recent years, the Ohio Courts of Appeals have consistently interpreted *Belvedere*'s "illegal act" requirement to mean a harmful, unfair, unjust, inequitable, or wrongful act rather than solely a criminal one.  *See*, *e.g.*, *Robert A. Saurber Gen. Contr., Inc. v. McAndrews*, No. CA2003-09-239, 2004 WL 2937627, at *5 (Ohio Ct. App. Dec. 20, 2004) (12th Dist.) ("McAndrews argues the second prong of the *Belvedere* test was not met in this case because he did not commit fraud or engage in criminal activity.  We find this argument to be without merit.  Other Ohio courts have recognized that although the *Belvedere* court used 'fraud' and 'criminal activity' in defining the second prong, the true question to be asked is whether it would be unjust under the circumstances of each case to not pierce the corporate veil."); *Tri-State Group, Inc.*, 2004 WL 1882567, at *14 (7th Dist.) (same);  *Sanderson Farms, Inc. v. Gasbarro*, No. 01AP-461, 2004 WL 583849, at *8 (Ohio Ct. App. Mar. 25, 2004) (10th Dist.) ("While the court in *Belvedere* employed the words 'fraud or illegal act,' Ohio courts, including this court, have held that the second prong is satisfied when 'unjust or inequitable' consequences occur."); *Stypula*, 2003 WL 22844296, at *3 (11th Dist.) ("the corporate veil may be pierced when the acts would lead to unfair or inequitable consequences"); *Dalicandro v. Morrison Road Develop. Co., Inc.*  No. 00AP-619, 2001 WL 379893, at *7 (Ohio Ct. App Apr. 17, 2001) (10th Dist.) (same); *Pritchett, Dlusky & Saxe v. Pingue*, No. 96APE11-1598, 1997 WL 578952 (Ohio Ct. App. Sept. 16, 1997) (10th Dist.) (same); *Weincek v. Atcole Co., Inc.*, 671 N.E.2d 1339, 1342 (1996) (3d Dist.) ("Based upon a reading of *Belvedere*, the purpose of the theory 'piercing the corporate veil,' and Ohio case law prior to and subsequent to *Belvedere*, we hold that one seeking to disregard the corporate entity may present evidence that the shareholder exercised his control over the corporation in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity in order to satisfy the second prong of the test enunciated in *Belvedere*.").  *Contra Collum v. Perlman*, No. L-98-1291, 1999 WL 252725, at *3 (Ohio Ct. App. Apr 30, 1999) (6th Dist.) (holding that expansion of *Belvedere* test by other appellate districts was an incorrect interpretation).  We note that, although many of these cases were not designated for print-publication, in 2002 the Ohio Rules of Court abolished the distinction between controlling and persuasive decisions based on the form of publication and indicated that "[a]ll court of appeals opinions issued after [May 1, 2002] may be cited as legal authority and weighted as deemed appropriate by the courts."  OHIO REV. CODE ANN. Rep R 4(B) (Baldwin 2005).

The courts of appeals rely for their broader interpretation upon language from *Belvedere*:

> A more vexing problem is presented by the Supreme Court's use of the words "fraud or illegal act" in the second element. Did it intend to restrict attempts to pierce the corporate veil to only those acts which were fraudulent or illegal or did it intend to encompass a broader range of actions, namely those acts which would lead to unfair or inequitable consequences? The *Belvedere* opinion indicates the latter, that it intended to allow a corporate veil to be pierced when inequitable or unfair consequences had resulted. In applying the law to the facts of the *Belvedere* case, the Supreme Court . . . noted that the purpose behind the exception to the general law of corporations is to prevent shareholders from hiding behind the fictional entity of the corporation "when it would be *unjust*." (Emphasis added.)
>        Moreover, we note that prior to its ruling in *Belvedere*, the Ohio Supreme Court had never specifically addressed the issue of what was encompassed in the definition of "fraud" in determining when to disregard corporate formalities and allow the corporate veil to be pierced. However, as noted in *LeRoux*'s, 602 N.E.2d at 688-689, the Ohio Supreme Court had (prior to its decision in *Belvedere*) endorsed the notion that fraud or an illegal act need not be the only determinant of whether a corporate veil can be pierced, but indicated that the corporate veil could be pierced if an injustice would result.

*Wiencek*, 671 N.E.2d at 1342 (citations omitted). Faced with this series of interpretations, the Ohio Supreme Court has neither clarified its test nor corrected the expansion initiated by the courts of appeals. We believe that the *Wiencek* court was correct to hold, based on the totality of the language in *Belvedere*, that the Supreme Court intended the veil piercing remedy to be available when the misdeeds of an individual, acting through her company, have caused serious civil, as well as criminal, injustice. Coupling that with the near-unanimity of the courts of appeals and the Supreme Court's failure to express disagreement with their interpretation, we find that the meaning of "illegal act" is unsettled and anticipate that the Supreme Court would agree with the overwhelming majority of courts of appeals and interpret the second requirement of the *Belvedere* test to cover unjust acts more broadly.

To apply this to the case at bar, then, we hold that Keeton used her control over Keeton Corp. to commit an unjust and harmful act. Breaches of contract, of course, happen all the time in business, especially because breach might be the most efficient course of action for one party. However, "[a] party who suffers a loss from a corporation's breach ordinarily has recourse against the corporation and its assets or guarantors . . . ." *Wilton Corp.*, 188 F.3d at 674. But Keeton fails to demonstrate that her breach was motivated by valid business concerns. She refused to pay Taylor Steel, even though she had herself been paid by Mountain Metals. Then, rather than negotiate with Taylor Steel about her alleged complaints, Keeton simply and without warning ceased all communication with the company. Furthermore, she hindered Taylor Steel from having recourse against her companies because once Taylor Steel filed suit, she closed the Keeton Corp. bank account, put Great Events, Inc. and Great Events, Inc. d/b/a Keeton Corp. out of business, and formed another limited liability company, Lana Keeton, LLC, to control the assets from her continuing steel brokerage business. Consequently, we find that Taylor has met its burden of proving the second element of the *Belvedere* test.

## IV

For the foregoing reasons, we **AFFIRM** the judgment of the district court and find Keeton individually liable for the debt Keeton Corp. owes to Taylor Steel.

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting. I agree with the majority's conclusion that Great Events, Inc. was the alter ego of Lana C. Keeton, with "no separate mind, will, or existence of its own," *Belvedere Condominium Unit Owners' Ass'n. v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1086 (Ohio 1993), primarily because Keeton's failure to produce corporate documents legitimately requested by Taylor Steel during discovery created a presumption that Taylor Steel would have been able to meet its burden on this issue. I have grave doubts, however, whether the majority is correct in holding that Keeton ran afoul of the second prong of the three-part test set forth in *Belvedere*, which postulates that the corporate veil cannot be pierced unless "control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity." *Id*. The Ohio Supreme Court explained that piercing the veil is "[a]n exception to th[e] rule [of limited liability] developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes." *Id*. at 1085.

As the majority notes, at least seven lower courts in Ohio courts have interpreted *Belvedere*'s language more broadly, piercing the veil not only in cases of "fraud or an illegal act," *id*. at 1086, but also in cases where "it would be unjust under the circumstances . . . to not pierce the corporate veil." *Robert A. Saurber General Contractor, Inc. v. McAndrews*, No. CA2003-09-239, 2004 WL 2937627, at *5 (Ohio Ct. App. Dec. 20, 2004) (unpublished); *see also Sanderson Farms, Inc. v. Gasbarro*, No. 01AP-461, 2004 WL 583849, at *8 (Ohio Ct. App. Mar. 25, 2004) (unpublished) (listing several Ohio cases that hold that "the second [*Belvedere*] prong is satisfied when unjust or inequitable consequences occur") (quotation marks omitted). At least one lower court in Ohio, however, has reached the opposite conclusion. *See Collum v. Perlman*, No. L-98-1291, 1999 WL 252725, at *3 (Ohio Ct. App. Apr. 30, 1999) (unpublished) (disagreeing with its sister courts that have interpreted the *Belvedere* standard to apply to unjust acts that do not rise to the level of fraud or illegality).

Because the expansive interpretation by the majority of Ohio's lower courts is at odds with the narrow language of *Belvedere* itself, and because most of those cases are unpublished opinions, I am uncertain whether they accurately reflect the Ohio Supreme Court's view on this issue. I would therefore resolve the uncertainty by certifying the following question to the Ohio Supreme Court: Does the second prong of *Belvedere*, which appears on its face to limit the remedy of piercing the corporate veil to cases in which control of the corporation "was exercised[] in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity," *Belvedere*, 617 N.E.2d at 1086, also allow the veil to be pierced in cases where control was exercised to commit "unjust acts" that do not rise to the level of fraud or an illegal act? *See* Ohio S. Ct. Practice R. 18 (permitting federal courts to certify questions of Ohio law to the Ohio Supreme Court).

If this question were to be answered in the negative by the Ohio Supreme Court, then I would decline to pierce the corporate veil in the present case. Taylor Steel, as the district court correctly notes, "failed to demonstrate any tortious conduct or intent on the part of Keeton" and did not allege that Keeton's conduct was illegal.

On the other hand, if the Ohio Supreme Court were to answer the question in the affirmative, then I would respectfully request the Court to provide a working definition of "unjust acts." The concept of limited liability, after all, would be rendered meaningless if a corporation's failure to pay a creditor were, by itself, deemed unjust. Yet I find the various lower court opinions in Ohio

unhelpful in articulating the parameters of the expanded *Belvedere* standard that they have applied in a conclusory manner. If the Ohio Supreme Court were to agree with this expansion of the second prong of *Belvedere*, then it would hopefully provide guidance as to what level the "unjust act" must reach—on the broad spectrum between the simple failure to pay a debt and outright fraud—before the courts will pierce the corporate veil.

In the absence of such guidance, I am unable to say with any degree of confidence whether Keeton's alleged misconduct, which appears to constitute somewhat more than the simple failure to pay Taylor Steel, but is certainly less egregious than fraud or an illegal act, justifies piercing the corporate veil under Ohio law. I would therefore certify the issue to the Ohio Supreme Court.